**MILWAUKEE AUCTION GALLERIES, LIMITED, and Joseph Van Goethem, a sole proprietor, doing business as Provenance Fine Arts, Plaintiffs–Appellants,**

v.

**O. Roy CHALK, Defendant–Appellee.**

No. 92–3579.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1993.

Decided Jan. 10, 1994.

Rehearing Denied Feb. 3, 1994.

---

Laurence C. Hammond, Jr. (argued), Jeffrey O. Davis, Quarles & Brady, Milwaukee, WI, for plaintiffs-appellants.

Michael Cohn, Zetley Law Offices, Milwaukee, WI, Jonathan S. Zucker, Zucker Law Office, Washington, DC (argued), for defendant-appellee.

Before POSNER, Chief Judge, MANION, Circuit Judge, and FOREMAN, District Judge.*

* Hon. James L. Foreman of the Southern District of Illinois, sitting by designation.

POSNER, Chief Judge.

Two art dealers brought this diversity suit for fraud and breach of contract against O. Roy Chalk, the well-known entrepreneur (and now Russia's Washington representative). Megan Rosenfeld, "Russia's Capitalist on the Potomac," *Washington Post,* June 20, 1991, p. D1. The district judge granted the defendant a directed verdict on the fraud count, and the jury rendered a verdict for the defendant on the breach of contract count. The law of Wisconsin governs the substantive issues.

An octogenarian, Chalk decided the time had come to sell part of his extensive art collection, which is housed in his apartment in New York City. Distrusting New York art dealers, he made an oral contract with the two plaintiffs whereby each would be entitled to a 5 percent commission, to be paid by the buyer, if they presented to Chalk someone who was ready, willing, and able to buy a work of art that he wanted to sell, and if the sale was made. These were nonexclusive contracts, so there was no question of taking the art to the gallery of either plaintiff to be shown—and anyway Chalk refused to let the art leave his apartment. To allay the plaintiffs' concern that Chalk would meet and deal directly with prospective buyers whom the plaintiffs brought him, cutting the brokers out, Chalk promised the plaintiffs that he would "protect" their commissions.

One prospect whom the plaintiffs brought to Chalk's apartment to view his art, Mr. Morishita, expressed particular interest in Renoir's "L'Enfant à la Pomme" but thought the price of $3.5 million too high. A year later a company controlled by Morishita bought the painting from Chalk for $2 million. Chalk refused the plaintiffs' demand for a commission on the sale. The same story was repeated with another buyer of another painting—Mary Cassatt's "Sara in a Dark Bonnet." These two sales are the foundation of the lawsuit.

■ The claim of fraud is based on two alleged misrepresentations by Chalk. The first was the promise to protect the plaintiffs' commissions. The making of a promise normally implies at the very least that the promisor does not have a fixed intention not to honor it; so, if he does have that intention, he is guilty of misrepresentation. *Hartwig v. Bitter,* 29 Wis.2d 653, 139 N.W.2d 644, 647 (1966); *U.S. Oil Co. v. Midwest Auto Care Services, Inc.,* 150 Wis.2d 80, 440 N.W.2d 825, 827 (1989); *FDIC v. Lauterbach,* 626 F.2d 1327, 1334 (7th Cir.1980) (applying Wisconsin law). But courts naturally are concerned lest every breach of contract be levered into fraud by the too-facile expedient of asking the jury to infer from the fact that the defendant did not perform his promise that he never intended to perform it. So the rule has grown up that nonperformance is not enough to ground such an inference; there must be additional evidence of the defendant's intentions at the time he made the promise. E.g., *Fowler v. Happy Goodman Family,* 575 S.W.2d 496, 499 and n. 3 (Tenn. 1978); *Manufacturers & Traders Trust Co. v. Cottrell,* 71 A.D.2d 538, 422 N.Y.S.2d 990, 993 (1979); *Restatement (Second) of Torts,* § 530, comment d (1977). There was no additional evidence here.

■ The second alleged misrepresentation is that when the plaintiffs inquired about their commission for the sale of the Cassatt, Chalk told them that the buyer was no one they knew, so they hadn't earned any commission. This misrepresentation, if it occurred (there is evidence that Chalk didn't know the connection between the buyer and the plaintiffs), constituted fraudulent concealment of the original (and nonactionable) fraud. Fraudulent concealment of legal liability is a form of fraud for which damages or other relief (most commonly, tolling the statute of limitations, as in *City of Madison v. Hyland, Hall & Co.,* 73 Wis.2d 364, 243 N.W.2d 422, 431 (1976)), can be obtained in an appropriate case. The plaintiffs, who sued within the statutory period, want damages. But as with any other tort, there must be evidence of injury before damages can be awarded; there was none. Another possibility not pursued—so we needn't discuss it—is that the fraudulent concealment alleged in this case was evidence of a fraudulent disposition that might provide the missing evidence on the original claim of fraud.

So the district judge was right to direct a verdict for the defendant on the claim of fraud. But he was wrong we think to refuse to give the instruction requested by the plaintiffs on "procuring cause." The refusal, which doomed their claim of breach of contract, was reversible error.

■ The owner of land or other property will often hire a broker to sell it for him and agree to pay the broker a commission if but only if he "procures" the person who ends up buying the property. As the district judge correctly instructed the jury, the requirement of "procurement" is not satisfied merely by the broker's having happened to disclose to the person who ended up being the purchaser that the property in question was for sale. *Terry v. Bartlett*, 153 Wis. 208, 140 N.W. 1133 (1913); *Al J. Goodman & Co. v. Bucyrus–Erie Co.*, 327 F.Supp. 107, 110 (E.D.Wis.1971), aff'd, 469 F.2d 1274 (7th Cir. 1972) (construing Wisconsin law); *Karelitz v. Damson Oil Corp.*, 820 F.2d 529 (1st Cir. 1987). The broker's role in the transaction must be more active than this. (The plaintiffs were retained under a barebones oral contract that, the parties agree, is to be given meaning by the practices of the trade.) If, however, the seller, having learned from the broker the name of a prospective purchaser, prevents the broker from rendering the services that would entitle him to a commission by going directly to the prospective purchaser and negotiating the sale without the broker's participation, the broker is entitled to the commission. *Bowe v. Gage*, 132 Wis. 441, 112 N.W. 469, 471 (1907); *Terry v. Bartlett, supra*, 153 Wis. 208, 140 N.W. at 1135; *Peter M. Chalik & Associates v. Hermes*, 56 Wis.2d 151, 201 N.W.2d 514, 519 (1972); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21, 23–24 (1971). This is an utterly routine, unquestioned principle of agency law, derived from the utterly routine, unquestioned principle of contract law that one party to a contract may not defeat the other's rights under the contract by preventing the other from fulfilling a condition precedent to the assertion of those rights.

■ The plaintiffs' entire case was founded on this "circumvention" principle of agency law so naturally they wanted the district judge to include it in the instructions to the jury, but he refused. The defendant argues that the instruction proposed by the plaintiffs was not a correct statement of the law because it did not use the magic words "fraud" or "bad faith." Instead it said "the broker must be considered the procuring cause if upon providing such information or making such an introduction you find that the seller dealt privately with the buyers in order to deprive the broker of commissions." But "dealt privately with the buyers *in order to* deprive the broker of commissions" is precisely what bad faith *means* in this context, and the plaintiffs can hardly be faulted for proposing an instruction that would set forth the legal principle on which they relied in the plainest form possible.

The contract issue was submitted to the jury by means of a rather confusing special verdict, though neither party makes anything of the point. The first question on the verdict form is, "Was there a contract in which the defendant would pay a commission to the plaintiffs if a buyer of the defendant's painting or paintings were procured via the services of the plaintiffs?" The jury answered "No," so didn't go on to question 2 ("Did the defendant violate such contract?"), or 6 ("What amount of money will fairly compensate the plaintiffs?"), to which they were instructed to skip if they answered 1 and 2 "Yes." A second block of questions on the special-verdict form consisted of questions 3 through 5, plus 6 if 3 through 5 were answered "Yes." Question 3 is, "Did the defendant promise to protect the plaintiffs' commissions in the event the defendant's painting or paintings were sold to buyers procured via the services of the plaintiffs?" The jury answered "Yes." Question 4 asks whether the defendant violated this promise ("No"). Question 5 asks whether the plaintiffs relied to their detriment, and was left blank because of the jury's answer to 4.

The first block of questions put the contract claim to the jury in terms appropriate to a conventional contract supported by an exchange of promises or other standard consideration; the second was in terms of promissory estoppel. *Skycom Corp. v. Telstar*

*Corp.,* 813 F.2d 810, 817 (7th Cir.1987) (Wisconsin law), and cases cited there; *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.,* 725 F.2d 1140, 1142 (7th Cir.1984). By answering Question 3, the first question in the promissory-estoppel block, "Yes," the jury found a legally enforceable promise to protect (i.e., pay, if the buyers didn't) the plaintiffs' commissions—provided the plaintiffs procured the buyers. But not being informed about the circumvention principle, the jury naturally found that the plaintiffs had not procured the buyers because they had not rendered any services beyond introducing the buyers to the defendant. The omission of the instruction proposed by the plaintiffs determined the answer to Question 4 and by doing so doomed a perfectly straightforward promissory-estoppel case.

We have been speaking of promissory estoppel as an alternative theory of breach of contract rather than as an alternative theory *to* breach of contract. But the latter characterization is more precise so far at least as Wisconsin law is concerned, and may have somewhat different implications for damages, *Hoffman v. Red Owl Stores, Inc.,* 26 Wis.2d 683, 133 N.W.2d 267, 275–77 (1965); cf. *Goldstick v. ICM Realty,* 788 F.2d 456, 462–64 (7th Cir.1986)—as indeed is true even when, consistent with *Restatement (Second) of Contracts* § 90 (1979), promissory estoppel is treated as a doctrine of contract law. E. Allan Farnsworth, *Contracts* § 2.19, pp. 99–101 (2d ed. 1990). It is pertinent to note, therefore, that the remand is limited to the plaintiffs' promissory-estoppel theory of liability.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.