USCA1 Opinion

 

 For the First Circuit ____________________ No. 96-2202 STEPHEN A. PALMACCI, Appellant, v. P. FERNANDO UMPIERREZ, Appellee. ____________________ RICHARD B. ERRICOLA, Trustee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Steven J. McAuliffe, U.S. District Judge] ____________________ Before Torruella, Chief Circuit Judge, Bownes, Senior Circuit Judge, and Lynch, Circuit Judge. ____________________ Dorothy F. Silver for appellant. Edward Foye, with whom Ian Crawford and Todd & Weld were on brief, for appellee. ____________________ August 11, 1997 ____________________ BOWNES, Senior Circuit Judge. This case arises out of a speculative investment that went bad. Plaintiff Stephen A. Palmacci invested $75,000 in a project, known as "the Chase project," to purchase and develop distressed real estate. He had heard that the defendant's brother, Gus Umpierrez, who was a real estate agent and knowledgeable in real estate matters, had "turned a pretty fast profit" on similar ventures, and he wanted to reap some of the same type of profits. Palmacci acknowledges that he understood the risks inherent in any investment and, in particular, the increased risk involved in the speculative type of investment in which he was getting involved. He claims that he took this risk because his friend P. Fernando Umpierrez ("Umpierrez"), the defendant, and Umpierrez's brother, Gus, promised to invest $75,000 of their own personal funds in the project. According to Palmacci's testimony, he "decided that if they thought it was worth the risk with the knowledge that Gus had, that [Palmacci] would do the same." Palmacci also claims that he relied on the representation that project funds would be placed in a trust, which he believed would reduce the chance of "things going bad." The project failed (for reasons that are not set forth in the record), and Palmacci received only 80% of his principal back.  Umpierrez filed a petition for bankruptcy protection under Chapter 7 of the United States Bankruptcy Code, and -2- 2 Palmacci filed an adversary proceeding pursuant to 11 U.S.C. S 523 (a)(2)(A), claiming that the debt owed him should not be discharged because it was the product of false representations. The United States Bankruptcy Court for the District of New Hampshire held a trial in the matter, and at the close of the plaintiff's evidence, entered a judgment as a matter of law in favor of the debtor, holding that the debt was dischargeable in bankruptcy. This ruling was affirmed by the United States District Court for the District of New Hampshire. We affirm. A court reviewing a decision of the bankruptcy court may not set aside findings of fact unless they are clearly erroneous, giving "due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013; see Commerce  Bank  &  Trust  Co.  v. Burgess  (In  re  Burgess), 955 F.2d 134, 137 (1st Cir. 1992); Fed. R. Civ. P. 52(c), advisory committee's note to 1991 Amendment (applying clearly erroneous standard in the case of a judgment on partial findings). The bankruptcy court's legal conclusions, drawn from the facts so found, are reviewed de novo. Martin v. Bajgar (In re Bajgar) , 104 F.3d 495, 497 (1st Cir. 1997). Although the district court has already reviewed the bankruptcy court's decision, on appeal we independently  1. The trial court styled its ruling as the grant of defendant's motion for a directed verdict. In essence, however, the ruling was a judgment as a matter of law on partial findings. See Fed. R. Bankr. P. 7052; Fed. R. Civ. P. 52(c). We will treat it as such. -3- 3 review that decision, applying the same standard of review that the district court applied. See  In re Bajgar , 104 F.3d at 497; In  re  G.S.F.  Corp., 938 F.2d 1467, 1474 (1st Cir. 1991). No special deference is owed to the district court's determinations. Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 30 (1st Cir. 1994). A finding of fact is clearly erroneous, although there is evidence to support it, when the reviewing court, after carefully examining all the evidence, is "left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (internal quotation marks omitted). Deference to the bankruptcy court's factual findings is particularly appropriate on the intent issue "[b]ecause a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor."  In re Burgess , 955 F.2d at 137 (internal quotation marks omitted) (applying S 727(a), relating to fraud by the debtor in representations in the course of the court proceeding). Particular deference is also due to the trial court's findings that depend on the credibility of other witnesses and on the weight to be accorded to such testimony. See Fed. R. Bankr. P. 8013; Keller  v. United  States, 38 F.3d 16, 25 (1st Cir. 1994). Of course, a trial court may not insulate [its] findings from review by denominating them credibility -4- 4 determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. Anderson, 470 U.S. at 575.  Section 523(a)(2)(A) of the Bankruptcy Code provides: S 523. Exceptions to discharge (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt --  (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by -- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. See 11 U.S.C. S 523(a)(2)(A). "Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's 'fresh start' policy," and, for that reason, the claimant must show that his "claim comes squarely within an exception enumerated in Bankruptcy Code S 523(a)." Century 21 Balfour Real Estate v. Menna (In re Menna), 16 F.3d 7, 9 (1st Cir. 1994); see In  re  Bajgar, 104 -5- 5 F.3d at 498 n.1. The statutory requirements for a discharge are "construed liberally in favor of the debtor" and "[t]he reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." Boroff v. Tully  (In  re  Tully), 818 F.2d 106, 110 (1st Cir. 1987) (internal quotation marks omitted). On the other hand, we have noted that "the very purpose of certain sections of the law, like [S 727(a)(2)], is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." Id. Likewise, other sections of the law, like S 523(a)(2)(A), are intended to make certain that bankruptcy protection is not afforded to debtors who have obtained property by means of a fraudulent misrepresentation. Palmacci alleges that Umpierrez made three misrepresentations which induced him to invest $75,000 in the project: (1) that Umpierrez and his brother would invest $75,000 of their own money in the project; (2) that the project would have a total investment of $250,000; and (3) that a trust would be established to hold the funds and to supervise the project.  With respect to each of these three claims, Palmacci was required to establish both that he had a valid claim against Umpierrez and that the claim should not be discharged in bankruptcy. See  Grogan v. Garner , 498 U.S. 279, 283 (1991). -6- 6 Here, the claim and the reason for exemption from discharge are essentially the same: the common law tort of false representation, also known as deceit.  Under the traditional common law rule, a defendant will be liable if (1) he makes a false representation, (2) he does so with fraudulent intent, i.e., with "scienter," (3) he intends to induce the plaintiff to rely on the misrepresentation, and (4) the misrepresentation does induce reliance, (5) which is justifiable, and (6) which causes damage (pecuniary loss). 2 F. Harper, et al., Law of Torts S 7.1, at 381 (2d ed. 1986); Restatement (Second) of Torts S 525 (1977). Regarding the first element, the concept of misrepresentation includes a false representation as to one's intention, such as a promise to act. "A representation of the maker's own intention to do . . . a particular thing is fraudulent if he does not have that intention" at the time he  2. In Field  v.  Mans, 116 S. Ct. 437, 443 & n.9 (1995), the Court construed S 523(a)(2)(A) to incorporate the "general common law of torts," i.e., the "dominant consensus of common- law jurisdictions, rather than the law of any particular State." Of course, if we were to hold that Umpierrez was not entitled to discharge them in bankruptcy, Palmacci's claims themselves would be determined in accordance with the common law of New Hampshire. 3. We set forth a similar, but not identical, list of elements in In  re  Burgess, 955 F.2d at 140. We interpret Burgess to apply the same test we have articulated in the text here, except for the fifth element. In Burgess our reliance element required "reasonable" reliance, but the Supreme Court has since held that "justifiable" reliance is the proper test. See Field, 116 S. Ct. at 445-46.  -7- 7 makes the representation. Restatement (Second) of Torts S 530(1);  see  Anastas v. American Sav. Bank (In re Anastas) , 94 F.3d 1280, 1285 (9th Cir. 1996). "The state of a man's mind is as much a fact as the state of his digestion." Restatement (Second) of Torts S 530 cmt. a. Likewise, "a promise made without the intent to perform it is held to be a sufficient basis for an action of deceit." W. Page Keeton, et al., Prosser and Keeton on the Law of Torts S 109, at 763 (5th ed. 1984) (footnotes omitted); see Restatement (Second) of Torts S 530(1) cmt. c. On the other hand, if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation. Restatement (Second) of Torts at S 530 cmts. b, d. This is true "even if there is no excuse for the subsequent breach. A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions." 4 Collier on Bankruptcy q 523.08[1][d], at 523- 43.  The test may be stated as follows. If, at the time he made his promise, the debtor did not  intend to perform , then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of S 523(a)(2)(A) are met). If he did -8- 8 so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made. See, e.g. ,  In re Anastas, 94 F.3d at 1285; Milwaukee Auction Galleries Ltd. v.  Chalk, 13 F.3d 1107, 1109 (7th Cir. 1994) (more than mere nonperformance of a contract was necessary to establish misrepresentation); Mellon  Bank  Corp.  v.  First  Union  Real Estate, 951 F.2d 1399, 1410-11 (3d Cir. 1991) (same);  Craft v. Metromedia, 766 F.2d 1205, 1219, 1221 (8th Cir. 1985). The scienter element refers to a different type of intent, namely, intent to deceive, manipulate, or defraud. Ernst  &  Ernst  v.  Hochfelder, 425 U.S. 185, 193 (1976). This requirement may be met in one of several ways: if the maker of the misrepresentation "(a) knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies; or (c) knows that he does not have the basis for his representation that he states or implies." Restatement (Second) of Torts S 526; see Keeton, et al., supra, S 107, at 740-42. Clause (b) of Restatement S 526 includes the situation where the maker of a misrepresentation asserts something "so positively as to imply that he has knowledge" of its factual basis, even though he is conscious that he does not know the fact to be true. Keeton, et al., supra, S 107, at -9- 9 742. Scienter exists even if he believes the "fact" is true, if he is aware that he does not in fact possess the certitude that he implies by the manner in which he makes his representation. See Restatement (Second) of Torts S 526 cmt. e. One who makes a statement as if it were one of positive fact ("as though he knew it") engages in a "conscious deception" if he realizes he does not know the truth of his statement, even though he honestly believes its truth. 2 Harper, et al., supra, S 7.3, at 393-94. In such a case, the person is deemed to have the intent to deceive (scienter), not so much as to the fact itself, but rather as to the extent of his information. Id. ("He has in effect represented that he knew a thing to be true when he knew that he only believed or surmised it to be true."); see Metropolitan  Life  Ins.  Co.  v. Ditmore, 729 F.2d 1, 5 (1st Cir. 1984) (Mass. law); Myron  N. Navison Shoe Co. v. Lane Shoe Co., 36 F.2d 454, 459 (1st Cir. 1929); Keeton, et al., supra S 107, at 742. "This is often expressed by saying that fraud is proved if it is shown that a false representation has been made . . . recklessly, careless of whether it is true or false." Restatement (Second) of Torts S 526 cmt. e; see In  re  Burgess, 955 F.2d at 140 ("false representation" under section 523(a)(2)(A)); Harper, supra, S 7.3, at 391-95. The standard of proof of each element of a S 523 claim is by a preponderance of the evidence. Grogan, 498 U.S. -10- 10 at 291. The burden of proof and the burden of production as to each element rests with the party contesting the dischargeability of a particular debt under Bankruptcy Code S 523. See  In re Burgess , 955 F.2d at 136;  see also  Insurance Co. of N. Am. v. Cohn (In re Cohn) , 54 F.3d 1108, 1120 (3d Cir. 1995) (regarding S 523(a)(2)(B)). Thus, if Palmacci failed to establish any one of the elements by a preponderance of the evidence, then the court should reject his claim. See In  re Burgess, 955 F.2d at 139; 9A Wright & Miller,  supra, S 2579, at 542-43 (a factual finding that negates one element of the plaintiff's prima facie case renders findings concerning other elements unnecessary). We will discuss each of Palmacci's three misrepresentation claims in turn. First, Palmacci claims that Umpierrez falsely represented that he and his brother would invest $75,000 of their own personal funds into the Chase project. Umpierrez responds that he made good on his representation because he did contribute $75,000 of his own personal funds, albeit by giving the bank a lien on the Chase project property as well as a second mortgage on his home. According to Umpierrez, encumbering the project property does not mean that he failed to satisfy his promise to contribute funds personally, because he never told Palmacci that he would not mortgage the Chase project property. The district court agreed with Umpierrez: it found that there was no -11- 11 misrepresentation because "there was no representation that a mortgage would not be placed on the project." We find this argument untenable. An ordinary lay person like Palmacci would not think, nor would it be reasonable to expect him to think, that Umpierrez's representation that he would invest "his own personal funds" in the Chase project could be read to include funds he borrowed from a bank secured by a mortgage on the project property itself. Thus, Umpierrez cannot claim that there was no misrepresentation. Umpierrez is more persuasive in contending that Palmacci's first claim fails on the element of scienter or fraudulent intent which is required in order to establish an exception to discharge under S 523(a)(2)(A). See 2 Harper, et al.,  supra, S 7.1, at 381; Restatement (Second) of Torts S 525. Palmacci does not dispute that Umpierrez intended to obtain most of the funds for his contribution to the project from a second mortgage on his residence. Palmacci's argument, in essence, is that, at the time Umpierrez induced Palmacci's investment with the promise to invest his own personal funds, Umpierrez's intention was fraudulent, based on a reckless indifference to the truth (which rose to the level of fraudulent intent) because Umpierrez knew or should have known that he did not have enough equity in the house to raise the money through a second mortgage, at least without encumbering the project property with a mortgage as well.  -12- 12 We must parse this issue with some care. The factual question to be determined by the trier of fact is not whether Umpierrez knew or should have known that he did not have the money available to invest, but whether in good faith he intended to keep his promise. This is because "[a] finding that a debt is non-dischargeable under 523(a)(2)(A) requires a showing of actual or positive fraud, not merely fraud implied by law ." In re Anastas , 94 F.3d at 1286 & n.3 (emphasis added) (quoting 124 Cong. Rec. H11089 (Sept. 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S.C.C.A.N. 5787, 6436, 6453 ("Subparagraph (A) is intended to codify current case law . . . which interprets 'fraud' to mean actual or positive fraud rather than fraud implied in law.")). This is not a negligence case where the standard is whether a reasonable person would have acted as Umpierrez did. See generally , 2 Harper, et al., supra, S 7.3, at 392-95. Fraudulent intent requires an actual intent to mislead, which is more than mere negligence. Diduck v.  Kaszycki  &  Sons  Contractors,  Inc., 974 F.2d 270, 277 (2d Cir. 1992). An honest belief, however unreasonable, that the representation is true and that the speaker has information to justify it is an insufficient basis for deceit. Keeton, et al., supra, at 742. A "dumb but honest" defendant does not satisfy the test of scienter. 2 Harper, et al., supra, S 7.3, at 393.  -13- 13 Of course, the very unreasonableness of such a belief may be strong evidence that it does not in fact exist. See Pullman-Standard v. Swint , 456 U.S. 273, 289 (1982);  Norris v. First Nat'l Bank in Luling (In re Norris) , 70 F.3d 27, 30 n.12 (5th Cir. 1995); In  re  Cohn, 54 F.3d at 1118-19 (permitting reckless disregard to be relied on as an evidentiary factor that is probative of intent to defraud, if the totality of circumstances supports that inference) (involving 11 U.S.C. S 523(a)(2)(B)). Where this conclusion is reached as an inference of fact, there is nothing inconsistent with that unreasonableness forming an evidentiary basis for a finding of intent. See Keeton, et al., supra, at 742. But then unreasonableness would be providing evidentiary ballast, not serving by itself as an element of the tort.  Id. For example, "[i]f [the] defendant had no adequate grounds for believing his statement to be true this may afford a rational inference that he did not in fact believe it to be true (so that there was scienter)." 2 Harper, et al., supra, S 7.3, at 393. The focus, however, should be on whether the surrounding circumstances or the debtor's actions "appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor."  In re Hunt , 30 B.R. 425, 441 (Bankr. M.D.Tenn. 1983).  Thus, while fraud may not be implied in law, it may be inferred as a matter of fact. The finder of fact may -14- 14 "infer[] or imply[] bad faith and intent to defraud based on the totality of the circumstances when convinced by a preponderance of the evidence." In re Anastas , 94 F.3d at 1286 n.3; In re Sheridan, 57 F.3d 627, 633 (7th Cir. 1995); cf. In re  Cohn, 54 F.3d at 1118-19 (S 523(a)(2)(B)). Among the circumstances from which scienter may be inferred are: the defendant's insolvency or some other reason to know that he cannot pay, his repudiation of the promise soon after made, or his failure even to attempt any performance. Keeton, et al., supra, at 764-65.  Where, as here, reckless disregard is being urged upon us as the basis for an inference of scienter, it is important to distinguish what the debtor is being accused of recklessly disregarding. Scienter may be found to exist where a debtor recklessly disregards the truth of the representation, e.g., in Umpierrez's case, whether he was recklessly indifferent to whether he would actually keep his promise to invest personal funds in the Chase project. See Restatement (Second) of Torts S 526 cmt. e. There must, nonetheless, be an actual finding of intent to deceive: mere inability to pay does not constitute such a finding.  See  In re Anastas , 94 F.3d at 1286 ("[T]he hopeless state of a debtor's financial condition should never become a substitute for an actual finding of bad faith."). This distinction is apparent from the structure of the statute itself: 11 U.S.C. S 523(a)(2)(A) -15- 15 specifically excludes misrepresentations regarding a debtor's financial condition, whereas 11 U.S.C. S 523(a)(2)(B) provides separately for such misrepresentations. Thus, to the extent Palmacci is claiming that Umpierrez implicitly misrepresented his financial condition, that is not grounds for an exception to discharge under S 523(a)(2)(A). In the instant case, if Umpierrez knew or clearly should have known that there was no realistic way for him to use his own money to invest, then that is probative of his lack of intent to keep his promise at the time he made the promise. But the focus must be on whether the representation was made in bad faith, i.e., whether he induced Palmacci's investment with the intention of reneging on his promise to invest personal funds (or while recklessly disregarding whether or not he would keep his promise). See In  re  Anastas, 94 F.3d at 1286 (debt incurred with the intention of avoiding the debt by petitioning for bankruptcy).  Palmacci contends that the court erred by relying exclusively on Umpierrez's self-serving testimony about his subjective intent, and failing to consider the surrounding circumstances in order to infer that Umpierrez's intent was not as he claimed it to be. We do not think Palmacci is correct in characterizing the trial court's reasoning as relying solely on Umpierrez's self-serving testimony while ignoring the circumstantial evidence Palmacci contends shows that testimony -16- 16 to be incredible. It is true that Umpierrez had just purchased the residence a few months earlier, for $105,000 and that he had an $80,000 mortgage on the residence at the time of purchase. Based on this undisputed fact, Palmacci claims that Umpierrez should have known that he only had $25,000 worth of equity in the home, against which he could borrow on a second mortgage without a likely encumbrance of the project property, and therefore that the bankruptcy court clearly erred in believing Umpierrez's testimony that, at the time he made his promise, he fully intended to keep it. Umpierrez's claim that an innocent lack of knowledge of these facts (and not a fraudulent intent) caused him to err when he promised to contribute the $75,000 arguably falls into the category of "reckless disregard for the truth" such as to rise to the level of establishing scienter. These were not, however, the only facts before the trial court. There was also testimony that Umpierrez had discussed getting a personal loan with a banker, and that the banker had told him he thought the loan would be possible. Moreover, Umpierrez testified that he had had the house appraised in October (shortly before the representation that induced Palmacci to invest his money) and the house was valued at $185,000, more than enough to secure a loan for the full  4. In addition, the Umpierrezes' share would include the $5,000 down payment they invested at the time of the purchase at auction.  -17- 17 amount of Umpierrez's promised contribution. Thus, even though Umpierrez did not have a commitment letter from the bank -- a fact that Palmacci emphasizes -- he could well have honestly believed that he could work something out with the bank whereby the bank could protect its security needs without encumbering the project property and therefore without rendering his representation to Palmacci fraudulent. The court's decision mentioned this possible interpretation, noting that the market value of the house in early November (when Palmacci was induced to make his investment in the Chase project) was not necessarily limited to the price that Umpierrez paid when he bought it in July. Absent a showing to the contrary, and bearing in mind that the burden of proof was on Palmacci, we must assume that the trial court considered all the testimony (and other evidence before it) in its entirety, as well as all reasonable inferences therefrom, before making its determination that Umpierrez did not intend to defraud Palmacci at the time he promised to contribute $75,000 of his personal funds to the project. We perforce reject Palmacci's claim that the court relied exclusively on Umpierrez's testimony and failed to consider the surrounding circumstances. Moreover, while Palmacci is correct that intent to deceive may be inferred from the totality of the circumstances, including inferences from circumstantial facts,  see  Desmond v. -18- 18 Varrasso  (In  re  Varrasso), 37 F.3d 760, 764 (1st Cir. 1994), scienter cannot be presumed,  id. at 764-65;  In re Cohn , 54 F.3d at 1120. "The mere breach of a promise is not enough in itself to establish the fraudulent intent." Keeton, et al., supra, S 108, at 764. Thus, although the evidence here might "support the bankruptcy court's decision had it inferred an intent to deceive from the circumstantial evidence admitted in this case, [it does] not compel such a finding and [does] not require us to reverse the court's holding." National Union Fire Ins. Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio) , 91 F.3d 296, 301 (2d Cir. 1996) (emphasis added) (quoting In  re  Sheridan, 57 F.3d at 634); see also In re Varrasso, 37 F.3d at 764-65. It is the province of the trial court to determine this issue: the court may choose to infer intent or not to draw that inference, based on all the evidence. Bonnanzio, 91 F.3d at 301; In re Varrasso, 37 F.3d at 764-65. The determination of whether scienter exists based on certain circumstantial facts must be treated merely as "a permissible inference of fact . . . and not a presumption of law, or else the distinction between fraud and negligence will be largely obliterated." 2 Harper, supra, S 7.3, at 393 (emphasis added). Even where "a factfinder lawfully might draw an inference of fraud from the totality of the circumstances," we accept the trial court's findings unless the evidence "compels" such a conclusion. See -19- 19 In re Varrasso, 37 F.3d at 764-65; In re Burgess, 955 F.2d at 137. If the [bankruptcy] court's account of the evidence is plausible in light of the record reviewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. at 573-74. In the instant case, Umpierrez testified that he thought he would be able to come up with his $75,000 investment from his personal funds, and the judge believed him, apparently taking into account all circumstances including the weight of the alleged unreasonableness of his belief. The bankruptcy court found, as a matter of fact, that Umpierrez did not intend to defraud Palmacci when he promised to contribute $75,000 of his own personal funds to the project. In the context of the record in this case, we read this as a determination that there was no scienter, i.e., that there was no knowing misrepresentation and no reckless disregard for the truth such as would rise to the level of fraudulent intent. After carefully reviewing the record in its entirety, we conclude that there is sufficient evidence for the trial court to have concluded that Umpierrez's intent was not fraudulent. We cannot say the trial court clearly erred in its choice of which inferences to draw from the evidence presented to it. -20- 20 Therefore we affirm the court's rejection of the first alleged misrepresentation claim. Palmacci's second claim is that Umpierrez misrepresented to him that the project would have a total capital contribution of $250,000. This claim is derivative from the first: to whatever extent Umpierrez fell short on his contribution of $75,000, there would result a like shortfall in the total project capitalization. Palmacci does not make any argument as to his second claim that differs from his arguments on the first claim. Therefore, our rejection of the second flows ineluctably from our conclusion as to the first.  Palmacci's third claim is that Umpierrez misrepresented the role of the trust that was created in connection with the Chase project. According to Palmacci's brief, Umpierrez represented that "the project was to be held in trust supervised by a New Hampshire attorney." Palmacci concedes that a trust was indeed set up after he made his investment, but he argues that "[t]he reality of the situation was that the trust had no role to play in the supervision of the project." Palmacci does not make it clear exactly what was allegedly represented to him regarding the trust's supervision  5. Palmacci also argues that the bankruptcy court erred in holding that he was not justified in relying on Umpierrez's representations. We need not decide this issue because, having failed to meet his burden on the intent element, it does not avail him that he may have met the remaining elements; he must satisfy all requirements in order to establish his claim. -21- 21 of the Chase project. In his brief he seems to imply that Umpierrez actually told him the trust would supervise the investment project itself (as opposed to being simply a vehicle for controlling the flow of funds). Scrutiny of Palmacci's factual assertions, however, in his testimony and in the factual portion of his brief, reveal a claim merely that Palmacci's "idea of the role of the trust" was that the trustee would be responsible for and control how funds were used by the builders. Because of this "idea," Palmacci "felt assured" that the project "would be supervised correctly, and there was less chance of things going bad." Palmacci did not testify as to the basis for his subjective understanding. For all we know, the basis could have been merely that Palmacci himself thought a trust always does so supervise, without any representation by Umpierrez beyond the mere creation of a trust. The bankruptcy court dismissed the trust issue on the ground that Palmacci could not have "justifiably relied" on the role of the trust as supervising the real estate project. The court reasoned that the trust was not established until November 11, 1991, several days after November 7, when Palmacci made his investment, so Palmacci could not have known the terms of the trust instrument and therefore could not have been justified in relying on any such terms. (The district court decision did not specifically address the alleged misrepresentation regarding the role of the trust.)  -22- 22 Palmacci is correct that the bankruptcy court's analysis is flawed. Even if the trust was not actually created until after he invested his money, Palmacci could conceivably have relied on verbal (or written) representations from Umpierrez -- made on or before November 7 -- as to how the trust would be structured or what its role would be once the trust was created. And it might well have been justifiable for Palmacci to rely on such representations regardless of whether the trust instrument had yet been drafted. If such representations were false and made with scienter, then this third claim could not be dismissed based on the trial court's reasoning. Nevertheless, we will affirm a correct result reached by the court below "on any independently sufficient ground made manifest by the record." AIDS Action Comm. of Mass. v. MBTA, 42 F.3d 1, 7 (1st Cir. 1994) (internal quotation marks omitted). Although the bankruptcy court's stated reason for rejecting Palmacci's argument concerning the establishment of a trust was based on flawed reasoning, its conclusion was correct. Our review of the record, including Palmacci's own testimony, reveals absolutely no evidence clearly indicating that Umpierrez's statements or actions were the basis for Palmacci's subjective "idea" or feeling that the trust would supervise the project. Indeed, as the bankruptcy court pointed out, the attorney who drew up the trust testified that the -23- 23 concept of a trust was not even discussed by the investors before Palmacci invested his money in the project. Thus, the only representation that is supportable on this record is that a trust would be created and that the trustee would be an attorney. This much was indisputably carried out. It is not enough for Palmacci to testify that his "idea of the role of the trust" was to supervise the operation of the project, without specifying the source of this idea. Because the record is devoid of evidence that would support a finding that a misrepresentation was made on the trust issue, we need not consider the dispute as to whether Palmacci was justified in relying on any alleged representation about the role of the trust. Finally, Palmacci alleges that the bankruptcy court erred as a matter of law when it restricted the testimony of Palmacci's expert witness to events that took place only prior to or soon after the transaction at issue. A trial court has wide discretion in determining the admissibility of expert testimony, especially where the issue is being tried directly to the bench. Allied  Int'l,  Inc.  v.  Int'l  Longshoremen's Ass'n, 814 F.2d 32, 40 (1st Cir. 1987). Of course, this latitude does not mean that, on appeal, we will abdicate our responsibility to review such a determination. But, like other evidentiary rulings, the exclusion of all or part of an expert's proffered testimony is subject to review for abuse of -24- 24 discretion. Williamson v. Busconi, 87 F.3d 602, 603 n.1 (1st Cir. 1996). The trial court's decision will be "sustained unless [its] discretion has been abused." Allied  Int'l, 814 F.2d at 40. In the instant case, the trial judge had heard testimony from the creditor, the debtor, and the attorney for the real estate project (who drew up the trust), as well as some of the testimony of the expert in dispute (i.e., that part of the expert's testimony relating to events that took place prior to or soon after Palmacci's investment in the project). The portion of the expert's proffered testimony that the court excluded related to whether, when the trust was dissolved in 1993, Umpierrez "received a disproportionate return on his investment, compared to other investors, which would be to the detriment of Mr. Palmacci."  Palmacci acknowledges, as we discussed  supra at 7-9, that the alleged fraud must exist at the inception of the debt, and statements or actions which were neither false nor fraudulent when made will not be made so by the happening of subsequent events. Nor does failure to carry out one's intentions constitute a basis for finding a debt nondischargeable under S 523(a)(2)(A) absent a showing that the claimed fraud existed at the inception of the debt.  Palmacci argues, however, that a promissor's subsequent conduct may reflect his state of mind at the time he -25- 25 made the promise, and thus may be considered in determining whether he possessed the requisite fraudulent intent  ab initio . It is true that subsequent conduct may be relevant to an earlier state of mind. In Williamson  v.  Busconi, 87 F.3d at 603, we concluded that the bankruptcy court abused its discretion by excluding evidence as to conduct  subsequent to a real estate closing, from which a factfinder reasonably could have inferred that Busconi had not intended to pay the note  at the time it was executed. The lower court in  Busconi said this evidence was irrelevant, and then expressly credited Busconi's testimony (although Williamson testified too). Finding that Williamson had failed to establish the requisite fraudulent intent, the bankruptcy court ruled the debt dischargeable.  Id. We rejected that reasoning, noting that:  As direct evidence is seldom available, fraudulent intent normally is determined from the totality of the circumstances. And since "subsequent conduct may reflect back to the promissor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent" at the time the promise was made, proper application of the "totality" test in this context often warrants consideration of post-transaction conduct and contemporaneous events. Id. at 603 (citation omitted) (quoting  Krenowsky v. Haining (In re  Haining), 119 B.R. 460, 464 (Bankr. D. Del. 1990)); cf. United States v. Rodriguez, 858 F.2d 809, 816 (1st Cir. 1988) ("later events often may shed light on earlier motivations"). -26- 26 In the instant case, however, that relevance is very attenuated. The facts of this case are nothing like the facts in the cases relied upon by Palmacci, where an overarching scheme to defraud the creditor was shown. In In  re  Haining, 119 B.R. at 464, the debtor engaged in a pattern of transferring all her assets to a third party to the detriment of her creditors. The court reasonably concluded that the debtor's fraudulent scheme began prior to the debt in dispute, and continued throughout the period. Similarly, in Comerica Bank v. Weinhardt (In re Weinhardt) , 156 B.R. 677, 680 (Bankr. M.D. Fla. 1993), the business into which the debtor was to have invested the creditor's funds never existed, and the debtor spent all the money on a gambling spree. The court concluded that evidence of the subsequent pattern of conduct helped to show that the debtor did not, even at the outset, intend to use the funds obtained for the purposes stated.  In the instant case, the disputed testimony simply does not rise to the same level of probative value on the issue of Umpierrez's intent to defraud in the inducement. The proffered testimony related to events almost two years after Palmacci's investment was induced. Moreover, the allegations  6. The timing and other aspects of relevance were not delineated in our opinion in Busconi. There we simply stated that the proffered evidence of subsequent conduct was evidence "from which a factfinder reasonably could have inferred that Busconi had not intended to pay the note at the time it was executed." 87 F.3d at 603. A similar conclusion cannot be drawn in the instant case. -27- 27 Palmacci sought to prove through his proffered expert -- that the losses on the investment were not proportionately shared and that the project's 1992 and 1993 financial statements indicated that Umpierrez did not spend all project money exactly as originally stated in the business proposal (although they did not indicate that he failed to apply the funds to the Chase project in some way) -- would not have been directly probative of Umpierrez's intent to deceive in 1991. Certainly the bankruptcy court, which heard all the evidence, did not abuse its discretion in refusing to hear the proffered expert testimony. Even if we were to conclude on the present facts that the bankruptcy court erred in excluding the expert testimony, we need not reverse on this issue because excluding this evidence did not affect Palmacci's substantial rights. See Busconi, 87 F.2d at 603. In order to win a reversal, an appellant who claims error in the admissibility of evidence must also show that the evidentiary ruling adversely affected his "substantial rights." See Fed. R. Bankr. P. 9005, 9017 (incorporating Fed. R. Civ. P. 61; Fed. R. Evid. 103(a)). Here, as in Busconi, "[i]n light of all the evidence in the record, we are not persuaded that the challenged judgment was substantially influenced by the [presumptively] erroneous evidentiary ruling." Busconi, 87 F.2d at 603 (citing  Lubanski v. Coleco Indus., Inc., 929 F.2d 42, 46 (1st Cir. 1991)). -28- 28 In conclusion, we see no basis in the record for second-guessing the trial court's determination that the Chase project did not implicate fraudulent misrepresentation, and that it was simply a failed real estate investment in which all investors (including both the debtor and the creditor) lost a portion of their investments. Palmacci had hoped to "turn[] a pretty fast profit on it," as he had seen Gus Umpierrez do on prior real estate deals. At the same time, Palmacci understood that he was taking a risk; he might not only not make a "fast profit" but he might lose money on the deal. Now that the project has gone sour, Palmacci cannot prevent Umpierrez from discharging his debts in bankruptcy unless he demonstrates all the elements of fraud or false representation. He has failed to meet this burden with respect to at least one element of each of the three misrepresentations that he has alleged. Accordingly, the judgment is  affirmed. Costs on appeal awarded to appellee. -29- 29